## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MICHAEL ETCHEGOINBERRY, BARLOW FAMILY FARMS, L.P., a partnership, and CHRISTOPHER TODD ALLEN, for themselves and on behalf of all others similarly situated,

                    Plaintiffs,

        v.

THE UNITED STATES OF AMERICA,

                    Defendant.

No. 11-564 L

Senior Judge Marian Blank Horn

**FIRST AMENDED CLASS ACTION COMPLAINT**

*Electronically filed on August 28, 2020*

### INTRODUCTION

1.    Through this action, Plaintiffs seek just compensation from the United States for an uncompensated physical taking of their properties for public use in violation of the Fifth Amendment to the United States Constitution.

2.    Plaintiffs are private property owners of farmlands located in the San Luis Unit service area of the Central Valley Project in Central California (collectively "Plaintiffs") and are all part of the Westlands Water District.  Plaintiffs' farmlands have required drainage to maintain their agricultural productivity; the soil of these farmlands contains an impermeable clay layer not far below the surface which traps irrigation water when applied to the land and prevents it from draining naturally.  Absent such drainage, wastewater settles beneath these lands, resulting in high water tables and the accumulation of saline groundwater.  The higher water tables and increased groundwater salinity make the land unsuitable for farming.  These conditions impact nearly 400,000 acres of farmland, including Plaintiffs' properties.

3.      The United States has had a longstanding obligation to provide drainage of subsurface wastewaters from Plaintiffs' farmlands in this area, but upon information and belief, the United States has deliberately and knowingly reneged on its obligation and has made clear it will not satisfy it.  As a result of undrained wastewaters, saline groundwater has accumulated beneath and upon and physically invaded Plaintiffs' properties, harming existing crops, reducing crop yields, limiting crop rotations, precluding certain types of crops from being planted, and deteriorating soil quality and conditions, among other adverse impacts.  Plaintiffs have been deprived of the full benefit and use of their farmlands, and the value of their properties has been substantially reduced.

4.      The United States has acknowledged for decades that drainage service is essential and mandated.  On numerous occasions, the United States has promised that it would provide the required drainage service to Plaintiffs' farmlands.  While facilities designed to drain Plaintiffs' farmlands were partially built by the United States and temporarily served a fraction of landowners in the drainage-impaired area, they were never extended to all landowners owed these services and they were never completed.

5.      Over twenty-five years ago, a federal district court twice held that the United States has an obligation to provide drainage to Plaintiffs' farmlands under the San Luis Act of 1960.  *See Firebaugh Canal Co. v. United States*, No. CV-F-88-634 (E.D. Cal. Mar. 12, 1995); *Sumner Peck Ranch, Inc. v. Bureau of Reclamation*, 823 F. Supp. 715 (E.D. Cal. 1993).  Twenty years ago, the United States Court of Appeals for the Ninth Circuit affirmed those rulings that imposed upon the United States an affirmative legal obligation to provide drainage.  *See Firebaugh Canal Co. v. United States*, 203 F. 3d 568 (9th Cir. 2000).

6. In response to these rulings, the United States represented it would satisfy its obligation to construct the facilities necessary to remove the saline groundwater from Plaintiffs' properties. Prompted by the Ninth Circuit's *Firebaugh* ruling, the United States worked on developing and adopting a plan to fulfill this obligation. But the United States ultimately made the affirmative choice to abandon its plan and renege on its drainage obligation.

7. Currently, none of Plaintiffs' farmlands are receiving any drainage service because the United States has elected not to provide it. The United States' affirmative policy to not provide the required drainage through the present day has resulted in high water tables and in saline groundwater beneath and upon Plaintiffs' properties, which have been the direct, natural and inevitable result of the United States' shirking of its drainage obligation.

8. Moreover, because Plaintiffs' farmlands have been subject and are currently subjected to the adverse effects attendant to the continuous absence of drainage facilities the United States has been obligated to provide, the combined effect of the rising water table and the accumulation of saline groundwater beneath and upon their properties has deprived Plaintiffs of the benefit of the productive use of their farmlands, and the value of their farmlands has been reduced.

9. Accordingly, Plaintiffs seek just compensation for the physical invasion and occupation of their properties.

## **JURISDICTION**

10. This Court has jurisdiction over the claim in this Complaint under 28 U.S.C. § 1491 (The Tucker Act) as a "claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." This is a claim seeking compensation for the taking of private property for public use without just compensation, which is actionable pursuant to the Fifth

Amendment to the United States Constitution.  Plaintiffs seek just compensation in an amount that exceeds $10,000 on this claim for relief.

## PARTIES

11.    Plaintiff Michael Etchegoinberry, an individual, is a landowner in the San Luis Unit service area who has owned approximately 139 acres of farmland (the real property located at Fresno County Assessor Parcel Numbers 028-170-31s, 028-170-32s, 028-170-63s, and 028-170-76s) in the drainage-impaired area of the Westlands Water District since April 23, 2008.

12.    Plaintiff Barlow Family Farms, L.P. is a California limited partnership for which Eric Barlow is a partner.  Barlow Family Farms is a landowner in the San Luis Unit service area which has owned approximately 640 acres of farmland (the real property located at Fresno County Assessor Parcel Number 060-190-18s) in the drainage-impaired area of the Westlands Water District since December 10, 2007.

13.    Plaintiff Christopher Todd Allen, an individual, doing business as Todd Allen Ranch, is a trustee of the Todd Allen and Cheryl Lynn Allen Family Trust, a landowner in the San Luis Unit service area which has owned approximately 165 acres of farmland (the real property located at Fresno County Assessor Parcel Number 011-130-15s) in the drainage-impaired area of the Westlands Water District since October 16, 2007.

14.    Defendant United States of America is a republic formed pursuant to the Constitution of the United States, and exercises the powers described therein subject to certain limitations, including the Fifth Amendment to the United States Constitution.

## CLASS ACTION ALLEGATIONS

15.    Plaintiffs bring this action as a Class Action under Rules of the United States Court of Federal Claims ("RCFC") 23(b) on behalf of a class defined as follows:

> All landowners located within the Westlands Water District ("Westlands" or "District") and served by the San Luis Unit of the Central Valley Project whose farmlands have not received the necessary drainage service the United States is required to provide under the San Luis Act (Pub. L. No. 86-488, 74 Stat. 156 (1960)).

16.     As used herein, Plaintiffs refers to the named Plaintiffs and the class they represent. The class is so numerous that joinder of all members is impracticable.  There are more than 650 Westlands landowners in the San Luis Unit whose farmlands' productivity has been impaired and value diminished because they have not received the necessary drainage service that the United States is required to provide.

17.     There are questions of law and fact common to the class.  The principal issue in this case is the physical invasion of Plaintiffs' farmlands with saline groundwater resulting from the United States' knowing and conscious defiance of law in choosing not to construct the required facilities to drain subsurface wastewaters from those properties.  The United States' decision to renege on its mandatory obligation to provide drainage to Westlands landowners has affected the entire class, thus making final relief appropriate with respect to the class as a whole.  The common questions of law and fact involved in this action thus predominate over individual questions.

18.     Plaintiffs' claims and their requested relief are typical of the claims of and relief sought by the class.  The claims of the named Plaintiffs and the class members arise from the same set of facts and are premised upon the same legal theories under the Fifth Amendment of the United States Constitution.

19.     The named Plaintiffs will adequately and fairly protect the interests of the class. The named Plaintiffs and class members possess the same interest.  They have suffered the same or similar injury—the taking of property rights—as a result of the United States' decision not to provide the required drainage to their farmlands.  Further, they seek the same remedy—just

compensation resulting from the physical invasion of their lands with saline groundwater.  Having represented classes in the past, counsel for the named Plaintiffs and the class has (a) experience in handling complex litigation; (b) knowledge of the applicable laws; and (c) adequate resources to commit to representing the class.

20.     A class action is the superior method for a fair and efficient adjudication of this controversy and substantial benefits will derive from proceeding as a class action.  Such treatment will permit numerous similarly situated persons to prosecute their common claims jointly in a single forum and thus avoids unnecessary duplication.  A class action provides an efficient, manageable method to adjudicate fairly the rights and obligations of the named Plaintiffs and class members.

## **BACKGROUND**

### The Central Valley Project

21.     The Central Valley Project is a United States Department of the Interior, Bureau of Reclamation ("Bureau") federal water project in California, designed to conserve state waters and put them to maximum beneficial use.  The largest reclamation project of its kind in the country, the Central Valley Project spans the length of California's expansive Central Valley.

22.     In 1952, the Westlands Water District was formed by the Fresno County Board of Supervisors upon petition by landowners in the region who sought to protect their farmlands.  The District encompasses large areas of land which, by reason of soil conditions, now, and at all times relevant hereto, require drainage to maintain the agricultural productivity of the land.  Without drainage service, saline groundwater builds up and accumulates beneath the farmlands, making them unsuitable for farming.  These high water tables and the accumulation of saline groundwater

eventually damage and destroy the agricultural productivity of the farmlands and diminish their value.

23.     In order to bring water from the Central Valley Project into Westlands, the infrastructure to convey water to the Westlands area needed to be constructed.  The Bureau constructed the San Luis Unit to serve that purpose.

<u>San Luis Unit</u>

24.     In 1956, pursuant to Section 9(a) of the Reclamation Project Act of 1939, the Bureau sent Congress a report entitled the "San Luis Unit, Central Valley Project," which examined the feasibility of water supply development in the area that was to be encompassed by the San Luis Unit.  The report recommended construction of the San Luis Unit, while acknowledging an anticipated drainage problem in the area that would make soils unsuitable for irrigation use if no drainage system were provided.  The report recommended a drainage system for the region that would dispose of saline groundwater.

25.     In 1960, Congress passed the San Luis Act (Pub. L. No. 86-488, 74 Stat. 156 (1960)).  The San Luis Act authorized the United States Department of the Interior ("Interior") to "construct, operate and maintain the San Luis Unit as an integral part of the Central Valley Project."  The principal purpose of the San Luis Unit was to furnish irrigation to land in Merced, Fresno, and Kings Counties in California, such as the farmlands belonging to Plaintiffs.  But the San Luis Act also required the United States to provide drainage service to Westlands, since the United States knew that the application of Central Valley Project water for irrigation in Westlands would require that drainage be provided to these lands.  For this reason, Congress expressly conditioned the construction of the San Luis Unit on the provision of drainage facilities.

26.     The drainage facilities contemplated in the 1956 feasibility report for the San Luis Unit, prepared by Interior and referred to in the San Luis Act, included a system of on-farm, subsurface drains that were to be connected to a local drainage collection system.  The local drainage collection system would empty into an interceptor drain that would convey wastewater to the Sacramento-San Joaquin Delta for disposal.

27.     Interior gave Congress written assurance that the drainage facilities described in the 1956 feasibility report would be provided to the lands in the San Luis Unit needing such services before construction of the San Luis Unit commenced.

<u>Westlands Contracts</u>

28.     In order to secure the appropriate water and drainage services, Westlands negotiated several contracts with the United States.  The first was a water service contract that guaranteed Westlands' long term water supply from the San Luis Unit and recognized the accompanying need for drainage.  The second was a contract for construction of the water distribution and drainage system to remove subsurface wastewaters from District farmlands.  Interim contracts extending these services and commitments followed.

*1963 Contract*

29.     On June 5, 1963, Westlands and the United States entered into the "Contract Between the United States and Westlands Water District Providing for Water Service," Contract No. 14-06-200-495A ("1963 Water Service Agreement").  Westlands entered into this agreement for the purpose of obtaining a long-term, reliable source of irrigation water for District farmlands as well as drainage service to prevent damage to those lands.

30.     The 1963 Water Service Agreement established a contract rate per acre-foot of Central Valley Project water delivered to Westlands landowners, which Interior, in its judgment,

determined would produce revenues sufficient to repay Westlands' share of the costs of constructing, operating and maintaining the major project facilities of the Central Valley Project and the San Luis Unit, including the San Luis Drain, and the construction of works connected with the irrigation system.

31.     The 1963 Water Service Agreement recites that the United States is "providing an interceptor drain to meet the drainage requirements" of the San Luis Unit and that Westlands "desires to contract . . . for drainage service by means of the interceptor drain . . . ."   The agreement defined the "interceptor drain" as the "physical works constructed by the United States pursuant generally to [the San Luis Act] in order to meet the drainage requirements of the area served by the San Luis Unit . . . ."

32.     The 1963 Water Service Agreement provided for the connection of the local drainage collection system from farmlands in the District to the San Luis Drain by establishing that such local drainage facilities of the District "may be connected to the interceptor drain" in such capacity and at such locations as may be mutually agreed upon.  On-farm, subsurface drains were to be constructed on District farmlands that would tie into the local drainage collection system that connected to the interceptor drain.

33.     The 1963 Water Service Agreement also provided that the per acre-foot water rate "shall include a drainage service component of not to exceed Fifty cents ($0.50) for the interceptor drain."  This service component paid to provide drainage service furnished by the United States by means of the San Luis Drain.

34.     Plaintiffs' farmlands are within the area contemplated to be provided with this drainage system.

*1965 Contract*

35.     On April 1, 1965, Westlands and the United States entered into the "Contract Between the United States and Westlands Water District Providing for the Construction of a Water Distribution and Drainage Collection System," Contract No. 14-06-200-2020A ("1965 Repayment Contract").  Westlands also entered into this contract to obtain drainage services that would ensure the productivity of District farmlands and prevent damage resulting from rising saline groundwater.

36.     The 1965 Repayment Contract recites that Westlands "desires that a water distribution and drainage collector system be constructed for the District by the United States acting by and through the Bureau of Reclamation, United States Department of Interior" and that the United States is "willing to undertake the construction of the aforementioned water distribution and drainage collector system" under the terms of the contract.  The contract makes clear that the water distribution system to be built encompasses "a drainage collector system and related facilities."  The contract further obligates the United States and the District to "exert their best efforts to expedite the completion of such features."

37.     Further, the 1965 Repayment Contract provides that the first construction group "shall include substantially all of the . . . drainage collector facilities . . . as initially required to serve the area" encompassed by the first construction group.  It further adds that "[c]hanges in . . . locations . . . as may . . . be expedient, economical, necessary, or advisable to the extent that such changes do not substantially change the basic character or service capability . . . may be made."

38.     Under the 1965 Repayment Contract subsequent construction on the remaining two construction groups was to be started "no later than June 30, 1974, and June 30, 1979, respectively."

39.     Plaintiffs' farmlands are within the area contemplated to be serviced by the drainage collector facilities.

*Interim Contracts and Repayment Contracts*

40.     Since the expiration of the 1963 Water Service Agreement at the end of 2007, Westlands and the United States have entered into a series of interim renewal contracts for the delivery of water, which provided the terms and conditions for water service until June 1, 2020: Contract No. 14-06-200-495A-IR1 through Contract No. 14-06-200-495A-IR7 (collectively "Interim Contracts"). As of June 1, 2020, the United States has been providing water service pursuant to a repayment contract, Contract No. 14-06-200-495A-LTR1-P.

41.     Each of the Interim Contracts and the repayment contract, Contract No. 14-06-200-495A-LTR1-P, carry over the United States' obligation to provide drainage services to the District and its landowners' farmlands.

Incomplete Drainage Construction

42.     In approximately 1968, the Bureau began construction of the San Luis Drain.

43.     The San Luis Drain was a principal engineering feature of the San Luis Unit.  Its function was to serve as the main drain for the drainage service area for the water districts in the San Luis Unit, including Westlands.  Thus, it was intended to receive drainage water from Plaintiffs' farmlands via the drainage collector system constructed under the 1965 Repayment Contract and to convey it to another location for discharge or disposal.

44.     As originally planned by the Bureau, an outlet was to be constructed to discharge drainage water via the San Luis Drain into the Sacramento-San Joaquin Delta.

45.     In 1972, the Bureau completed its first stage of construction, which included the Kesterson Reservoir in Gustine, California and the adjacent reach of the San Luis Drain.

46.     By 1975, the San Luis Drain had been extended southward to Westlands.  The Bureau stopped construction of the San Luis Drain at Kesterson, a point approximately 60 miles north of Westlands, a little less than half the distance to the planned discharge point in the Sacramento-San Joaquin Delta, citing environmental questions and concerns.

47.     Beginning in approximately 1976, the United States constructed the first phase of the drainage collector system to serve an area of approximately 42,000 acres in the northeastern part of Westlands, near the town of Mendota.  This 42,000-acre area was only a fraction of the nearly 400,000-acre, drainage-impaired area that was to be served by the complete drainage collector system.

48.     A year before the first phase of construction concluded in 1979, the United States advertised for bids for the construction of the second phase of the drainage collector system, which would have expanded the drainage service area to the south to serve an additional area of approximately 57,000 acres, another fraction of the overall drainage-impaired area that the drainage collector system was intended to reach.

49.     But the United States rejected all bids and did not award the proposed second-phase construction contract because the Bureau determined that there were insufficient funds in the authorization limit set forth in the San Luis Act for local distribution systems and drains to pay for the remaining construction.

50.     In making that determination, the United States improperly accounted for costs of the San Luis Drain, a major project facility subject to a different statutory authorization limit, as if it were a local drainage collection facility to be charged against the Act's $192,650,000 authorization limit.  In 1986, the Solicitor of Interior ruled that it had been improper to charge the cost of the San Luis Drain against this authorization limit for local distribution systems and drains,

and that said costs should have been charged against the San Luis Act's separate authorization limit of $290,430,000 (indexed to 1960 dollars) applicable to major project facilities.  Nevertheless, the United States did not construct the second phase of the drainage collector system.

51.    Since no construction of drainage facilities was completed beyond the first phase of construction, between approximately 1977 and 1986, only farmlands in the 42,000-acre drainage service area received drainage service.  Thus, drainage service was only partial, since thousands of acres of drainage-impaired farmlands located outside the 42,000-acre area never received drainage service.  For the 42,000 acres of farmlands that did receive drainage, the benefit was only temporary, lasting until 1986, when the United States plugged the only section of the drainage collector system it had built.

52.    Upon information and belief, the stoppage of work on the drainage collector system after only the first phase of construction and the cancellation of the second phase of construction were authorized acts of the United States.

<u>Kesterson Reservoir</u>

53.    For the farmlands that received temporary drainage services, Kesterson Reservoir ("Kesterson") served as a terminal disposal site for their drainage waters since the San Luis Drain was never completed to the north of Kesterson.  Kesterson, which was designed and constructed by the Bureau and has been operated by the Bureau, was intended to be a regulating reservoir for the San Luis Drain between Kesterson and the Sacramento-San Joaquin Delta.  Since the San Luis Drain was never completed, however, the Bureau repurposed Kesterson as the terminal disposal site for drainage water from the 42,000-acre drainage-service area.  Kesterson had also been designated as a National Wildlife Refuge based on a 1972 agreement between the Bureau and the United States Fish and Wildlife Service ("Fish & Wildlife").

13

54.     Kesterson became essential to providing drainage service to Westlands because no discharge outlet for the 42,000 acres was ever provided by the United States.  But the capacity of Kesterson Reservoir was insufficient to provide drainage service to any lands outside of the 42,000-acre drainage-service area, or to any lands within the 42,000-acre drainage-service area for which on-farm subsurface drains had not been installed by the early 1980s.

55.     Drainage water was disposed of at Kesterson by evaporation.  This disposal method concentrated naturally occurring selenium and various other constituents in the water, soils and plants at Kesterson.  If the San Luis Drain had been completed, the concentration of selenium and other constituents would have been diluted and mixed with the waters of the Delta, Bay and Pacific Ocean by river outflow and tidal action.

<u>The Closure of Kesterson and the San Luis Drain</u>

56.     In 1983 and 1984, deformities and mortalities were noted in some of the waterfowl at Kesterson.  These deformities and mortalities appear to have been caused when the waterfowl fed on plants and animals at Kesterson, which contained high concentrations of selenium.

57.     In February 1985, the California State Water Resources Control Board issued a Cleanup and Abatement Order against the Bureau, requiring it to clean up Kesterson or close down its operations as a drainage disposal facility by February 1988.

58.     In March 1985, Interior announced that it had instructed Fish & Wildlife to begin the process of plugging the San Luis Drain and shutting down Kesterson, a process that, it was announced, was to result in closing off the drainage collector system serving the 42,000-acre drainage-service area from the San Luis Drain and/or halting the delivery of irrigation water to lands that then drained into Kesterson.

59.     On April 3, 1985, Westlands entered into an agreement with the United States which obligated the Bureau to continue to provide water service to the 42,000-acre drainage-service area and required that Westlands reduce the flow of drain water from the area into Kesterson and certain portions of the San Luis Drain in accordance with a short time schedule.  If the short time schedule could not be met by providing alternative means of disposal, Westlands was required to close the drains at the collector system, and if it did not, Interior reserved the right to close the drains at Westlands' expense.  Westlands' agreement to the terms of the April 3, 1985 Agreement was the direct result of the threat by the United States to halt certain deliveries of irrigation water to Westlands.

60.     The April 3, 1985 Agreement reserved the rights of the parties regarding the delivery of irrigation water and "the disposition of drain water for future negotiation or litigation, including but not limited to, Westlands' claim of right to adequate drainage service by the United States for all lands within Westlands needing such service."

61.     Westlands undertook a number of projects to replace Kesterson as a disposal site for the drainage water to meet the schedule for flow reductions in the San Luis Drain required by the April 3, 1985 Agreement.  These projects allowed the initial flow reduction to be met but proved unsuccessful with regard to providing a site and an economically and technically feasible method for disposing of the wastewaters being produced in the 42,000-acre drainage-service area.  As a result, the time schedule for the reduction and elimination of flows in the San Luis Drain could not be met.  The drains in the collector system were physically plugged in 1986 in order to stop the flow of wastewaters from Westlands into the San Luis Drain.

62.     At the time drainage services to District farmlands were shut down by the United States, approximately 85 miles of the San Luis Drain, extending from Kesterson in the north to

Five Points Ranch, California in the south, had been constructed.  The San Luis Drain was never constructed north of Kesterson to the planned point of discharge.

63.     Upon information and belief, the closing of Kesterson and the plugging of the San Luis Drain were authorized acts of the United States.

64.     Since June 1986, no drainage service has been provided by the United States to any landowner in the District.  At all times, however, the United States has had an obligation to provide drainage service to farmlands in the District, including a method for the disposal of subsurface wastewater accumulating under Plaintiffs' farmlands.

65.     Upon information and belief, the United States' acts and policies described here – to stop work on the San Luis Drain and eventually plug it and close the Kesterson reservoir, and to defy legal obligations by abandoning all subsequent efforts to provide drainage for both the 42,000-acre area that temporarily received drainage and the remainder of the District that never received drainage – were affirmative and authorized acts.

66.     The United States' affirmative acts and policies regarding drainage in the Central Valley have resulted in the high water tables and saline groundwater that had long been recognized as a threat to the agricultural productivity of District farmlands, including Plaintiffs' properties. The adverse impacts characteristic of high water table and saline groundwater—limited crop rotations, decreased crop yields, stunted or retarded crop growth, decreased crop yields, sterile land precluding any crop growth, poor soil quality and conditions—have been the direct and inevitable result of these affirmative acts and policies.  Plaintiffs have been deprived of the benefit of the full productive use of their farmlands, and the value of their farmlands has been reduced.  Upon information and belief, by pursuing these affirmative acts and policies, the United States has benefitted and will benefit.  The United States has avoided significant expenditures of money, and

would additionally save significant amounts of money by avoiding interest free reimbursement of capital costs incurred to provide drainage, over a forty-year term.

Drainage Litigation

*The Barcellos Judgment*

67.     In 1986, a stipulated judgment in *Barcellos & Wolfsen, Inc. v. Westlands Water District*, No. CV-79-109 EDP (E.D. Cal. filed Apr. 26, 1979) and *Westlands v. United States*, No. CV-81-245 EDP (E.D. Cal. filed 1981) (the "*Barcellos* Judgment") settled a consolidated action involving Westlands, landowners and water users within Westlands, and the Bureau.  *Barcellos*, No. CV-79-109 EDP (E.D. Cal. Dec. 30, 1986).   In addition to addressing the supply of water to Westlands, the *Barcellos* Judgment also addressed the provision of drainage services to the District.

68.     The *Barcellos* Judgment preserved claims against the United States concerning the right to drainage service or drainage service facilities.  It provided that any claims against the United States concerning the right to drainage service or drainage service facilities could be asserted only upon the occurrence of certain conditions specified therein, including conditions relating to a drainage plan, which the United States was required to submit to Westlands by December 31, 1991.  The drainage plan was required to include drainage service facilities with sufficient aggregate capacity to transport, treat, and dispose of not less than 60,000-acre-feet and not more than 100,000-acre-feet of subsurface drainage water per year from Westlands by December 31, 2007, and was also required to be cost effective, financially feasible, and capable of acquisition, construction, and operation in compliance with all applicable laws.  The *Barcellos* Judgment provided for the creation of a trust using funds collected from Westlands' landowners to pay the costs of the design and construction of these drainage service facilities.  Further, it also allowed the "revival of any claims against the United States of the right to drainage service or

17

Drainage Service Facilities" if the United States failed to adopt a drainage plan by 1991 that met the necessary requirements.

*The Firebaugh Canal and Sumner Peck Cases*

69.     In 1988, the Firebaugh Canal Water District and landowners affected by the drain closures of 1986 filed suit against the United States Bureau of Reclamation and Westlands for various forms of relief related to drainage. *Firebaugh Canal Co. v. United States*, No. CV-F-88-634 (E.D. Cal. filed December 9, 1998).  In 1991, certain landowners also filed suit against the United States and Westlands for various forms of relief related to drainage. *See Sumner Peck Ranch v. Bureau of Reclamation*, No. CV-F-91-048 (E.D. Cal. filed January 31, 1991).

70.     In May 1992, the two cases were partially consolidated to resolve the mutual allegation that Interior was required by law under the San Luis Act to construct facilities to drain subsurface water from District farmlands.

71.     In May 1993, the district court ruled that "[t]he San Luis Act requires [Interior] to make provision for drainage for the San Luis Unit as specified in the Act.  The failure to do so violates the Act." *Sumner Peck*, No. CV-F-91-048 (E.D. Cal. May 14, 1993) (order granting plaintiffs' motion for partial summary judgment).

72.     Thereafter, the district court ordered a trial on the issue of whether or not the obligations of the United States to provide drainage service to Westlands and its landowners had been excused by subsequent legislation, impossibility, impracticability, or any other reason. *Id.*

73.     In December 1994, the district court reprimanded the United States for not having "undertaken activities to complete the drain" since the court had issued its May 1993 order declaring that the San Luis Act required completion of the drain and issued the following findings of fact:

- "Since the mid-1980s, the Bureau has not undertaken any efforts to complete the San Luis Drain in order to physically remove saline subsurface agricultural drainage water from the drainage service area.

          . . . .

- The [United States] ha[s] failed to take necessary steps to provide drainage for a number of years.  The Bureau is unlikely to undertake efforts to provide drainage service unless ordered to do so by the Court.

- The Court finds that the federal agencies that have responsibility for providing drainage to the San Luis Unit have not effectively addressed the serious problems of water-logging and salt accumulation that are destroying the plaintiffs' ability to farm their lands in the San Luis Unit."

*Sumner Peck*, No. CV-F-91-048 (E.D. Cal. Dec. 2, 1994) (findings of fact and conclusions of law).

74.     The district court also found that the United States' obligation to provide drainage services contemplated by the San Luis Act was not foreclosed or excused by factual or legal impossibility, illegality, implied repeal, or any other reason.  *Id.*

75.     In addition, the district court issued the following conclusions of law:

- "The Secretary of the Interior through the Bureau of Reclamation has made the policy decision not to complete the San Luis Drain, in violation of Section 1 of the San Luis Act.  This action constitutes agency action unlawfully withheld.

- The Secretary must be provided the opportunity to comply with the law to provide drainage to the San Luis Unit."

*Id.*

76.     In 1995, the district court echoed these conclusions in a ruling on a partial motion for summary judgment for plaintiffs, holding that the United States had a statutory obligation to provide drainage and issuing a permanent injunction commanding the United States to apply for the permits necessary to complete the San Luis Drain.  *Firebaugh Canal Co. v. United States*, No. CV-F-88-634 (E.D. Cal. Mar. 12, 1995) (partial findings of fact and conclusions of law regarding statutory obligation).   Interior appealed this judgment.

19

77.     In 2000, the U.S. Court of Appeals for the Ninth Circuit affirmed the substantive rulings of the district court's 1993 order and 1995 judgment.  The Ninth Circuit ruled that the United States had made a deliberate policy decision not to provide drainage, and that such decision was in violation of the unambiguous mandatory drainage obligation enacted by Congress in the San Luis Act.  It rejected the United States' defenses based on appropriation riders, factual and legal impossibility, and impracticability.  Accordingly, the Ninth Circuit required the United States to provide drainage to the San Luis Unit pursuant to the San Luis Act "without delay." *Firebaugh Canal Co. v. United States*, 203 F. 3d 568 (9th Cir. 2000) ("Ninth Circuit Opinion").

78.     The Ninth Circuit Opinion also held that since 1992, Congress had given the United States supplemental authority as to how to provide drainage, and the court therefore reversed and remanded the district court injunction as invading an area of administrative discretion in directing how Interior was to fulfill its statutory obligation to provide drainage.  *Id.*

79.     Thereafter, upon remand, the district court issued a new permanent injunction directing the United States to provide drainage to the San Luis Unit promptly and without delay. Rather than directing the United States to complete the original drainage plan, the district court ordered the United States to submit a new plan by January 29, 2001, for promptly providing the required drainage.  *Sumner Peck*, No. CV-F-91-048 (E.D. Cal. Dec. 18, 2000) (order modifying partial judgment on findings of fact and conclusions of law regarding statutory obligation) ("Drainage Order").

80.     Since issuing the Drainage Order, the district court has been overseeing its implementation, and the federal defendants in the partially consolidated *Firebaugh* and *Sumner Peck* actions regularly apprise the court of the status of compliance with the order.

<u>United States' Ongoing Refusal to Implement the Drainage Order and
Failed Negotiations for Alternative Resolution to Drainage Problem</u>

81.     In 2001, the United States began development and analysis of various alternatives that would address the United States' obligation to provide Westlands landowners drainage pursuant to the Drainage Order.  In April 2001, the Bureau developed the San Luis Drainage Feature Re-evaluation Plan of Action, which outlined its proposed efforts to provide prompt drainage service based on its consideration of a variety of options.  In December 2001, the Bureau issued the San Luis Unit Drainage Feature Re-evaluation Preliminary Alternatives Report, which identified the range of options for drainage systems that could be utilized.

82.     In December 2002, the Bureau published the Plan Formulation Report, San Luis Drainage Feature Re-evaluation, which set forth the analysis of the alternatives for providing drainage to the San Luis Unit and identified the proposed action the Bureau would pursue to meet the United States' drainage obligation.

83.     In July 2004, the Bureau filed an Addendum to its Plan Formulation Report, San Luis Drainage Feature Re-evaluation, which further refined the components of the proposed action. The Addendum additionally set forth a timeline for completion of an Environmental Impact Statement and Record of Decision.

84.     In May 2006, the Bureau released its Final Environmental Impact Statement related to the San Luis Drainage Feature Re-evaluation, which provided a detailed evaluation of the drainage options.

85.     By early 2006, the *Firebaugh* and *Sumner Peck* parties also began settlement negotiations to seek an alternative resolution of the drainage issue.  As a result of these settlement discussions, the Bureau delayed execution of its Record of Decision.

86.     In March 2007, the Bureau signed a Record of Decision for the San Luis Drainage Feature Re-evaluation ("ROD"), in which the Bureau selected the "In-Valley/Water Needs Land Retirement Alternative" as the project to fulfill its drainage obligation to Plaintiffs' farmlands in the San Luis Unit.

87.     The selected "In-Valley/Water Needs Land Retirement Alternative" included drainage reduction measures, drainage water reuse facilities, and treatment systems, as well as the retirement of nearly 200,000 acres of land from irrigated farming.

88.     The ROD suggested that implementation of the In-Valley/Water Needs Land Retirement Alternative would likely require new authorizing legislation to increase the appropriations ceiling for funding beyond what was authorized by the San Luis Act, and that appropriation of such funds by Congress would be needed.

89.     In July 2008, the Bureau completed and submitted to the United States Congress its San Luis Drainage Feature Re-evaluation Feasibility Report, which presented Congress with the relative economic benefits and costs of the Project, as outlined in the ROD.

90.     The July 2008 Feasibility Report estimated that approximately 12 years of design and construction work would be necessary to implement the drainage system under the In-Valley/Water Needs Land Retirement Alternative.

91.     Accordingly, the July 2008 Feasibility Report set forth a number of recommended Congressional actions needed for implementation of the ROD, including raising the San Luis Act appropriations ceiling for distribution systems and drains and making other specific changes to reclamation laws.

92.     In late 2008, pursuant to their ongoing negotiations, the *Firebaugh* and *Sumner Peck* parties, the Bureau, and other stakeholders convened to reach an alternative negotiated resolution of

the drainage issues.  By January 2009, legislative language had been drafted for Congressional authorization on this resolution.  Ultimately, however, no consensus on a draft legislative proposal was achieved and the settlement discussions ended in failure.

93.     Meanwhile, in July 2009, the Bureau reported that, due to the change in the presidential administration of the United States, it was unable to report to the district court as to when it would provide drainage to the San Luis Unit pursuant to the Drainage Order.  The district court ordered the United States to "provide a report . . . identifying what specific actions will be taken to provide drainage to the San Luis Unit and a specific time table to implement drainage" by late October 2009.  The district court provided notice that "no further delay shall be permitted in this case and in the event the [United States] continue[s] to fail and refuse to provide the drainage long ago ordered by the Courts, this case shall proceed to an enforcement of judgment stage." *Firebaugh*, No. CV-F-88-634 (E.D. Cal.  July 22, 2009) (scheduling conference order).

94.     In October 2009, the Bureau submitted to the district court a report that failed to provide any timetable to implement the drainage in any area in the San Luis Unit.  The Bureau did not describe any efforts made to implement the ROD or to seek the necessary Congressional actions to implement the ROD.  Rather, the Bureau reported that Congress had not acted on the recommendations contained in the 2008 Feasibility Report and stated that it was unclear when Congressional action on the report would occur.  The Bureau further acknowledged that no consensus on a draft legislative proposal for an alternative drainage resolution was achieved.

95.     In November 2009, the Bureau reported to the district court that it would commence implementation of the 2007 ROD, within the Bureau's existing authorities and the existing appropriations ceilings under the San Luis Act and subject to applicable law and the availability of funds appropriated by Congress for this purpose.  However, due to appropriations ceilings,

implementation was to be initially limited to one sub-unit of drainage facilities in Westlands'
northern sub-unit.  Additionally, the Bureau again reaffirmed its "intention to finalize the elements
of a legislative proposal on a long-term drainage strategy" that the United States could support by
the end of 2009.

96.    In November 2009, the Bureau submitted a Control Schedule detailing the actions it
intended to pursue for the decade between 2010 and 2019.  The Control Schedule proposed limited
expenditures for only Westlands' northern sub-unit and failed to account for a complete drainage
solution for the full expanse of drainage impaired farmlands in the District as contemplated by the
ROD.

97.    By the end of 2009, upon information and belief and contrary to its representation to
the district court, the Bureau did not finalize any legislative proposal on a long-term drainage
strategy.

98.    On September 1, 2010, the Bureau submitted to Senator Dianne Feinstein of
California a letter that included elements of a new alternative drainage strategy that contravened the
2007 ROD, which had been adopted by the Bureau and which the Bureau had previously agreed to
implement.  Rather than focusing on legislation to increase the appropriations ceiling under the San
Luis Act for implementation of the ROD, the Bureau's letter to Senator Feinstein presented an
alternative strategy whereby, instead of implementing the ROD, Westlands and other San Luis Unit
water districts would assume the responsibility for drainage service.  Pursuant to this approach, all
costs would be transferred to the San Luis Unit water districts.  Nothing in the letter to Senator
Feinstein involved or was directed at lifting the appropriations ceiling erected by the San Luis Act.
Upon information and belief, the Bureau's letter to Senator Feinstein was a reflection of a
deliberate, affirmative, and authorized choice by the United States to defy its legal obligations

under statutory law and court order, and to assign the responsibility to provide drainage to Plaintiffs' lands to local water districts.

99.    In November 2010, the Bureau deflected requests made by Westlands for an informational hearing to ascertain the Bureau's intent with respect to seeking passage of the necessary legislation for implementation of the ROD and on what schedule.  No informational hearing was held.

100.    On April 7, 2011, the District responded to the Bureau's September 1, 2010 letter with a letter to Senator Feinstein as well as the Bureau.  The District expressed its vehement opposition to the Bureau's alternative drainage strategy and stated it would vigorously oppose any legislation that repudiated the 2007 ROD that the Bureau had previously committed to implement.

101.    On November 4, 2011, the Bureau submitted a revised Control Schedule to the district court in *Firebaugh*, reallocating certain proposed limited expenditures for Westlands' northern sub-unit to a portion of Westlands' central sub-unit.

102.    On September 16, 2015, the federal defendants in *Firebaugh* reported to the district court that Westlands and the United States executed a Settlement Agreement that would provide the means for resolving claims in this case and in *Westlands*, and which could also affect drainage service orders in *Firebaugh*.  Implementation of this settlement agreement required enactment of authorizing federal legislation.  The proposed limited expenditures for Westlands' central sub-unit were suspended during a partial stay of the *Firebaugh* litigation as Westlands and the United States sought authorizing federal legislation.

103.    Again, these settlement efforts failed.  The required authorizing federal legislation was never enacted.  Accordingly, on January 15, 2018, the partial stay in the *Firebaugh* litigation expired, requiring the Bureau to resume work under the Control Schedule.  Even if the Bureau ever

completes the proposed limited expenditures for a portion of Westlands' central sub-unit under the Control Schedule, it would provide only a fraction of the required drainage solutions.  The United States' obligations under the San Luis Act and court decisions would remain.

104.    To date, Congress has not acted to adopt the legislative changes described in the 2008 Feasibility Report necessary to raise the appropriations ceiling for implementation of the ROD that would provide drainage to Plaintiffs' farmlands.

105.    To date, Congress has not passed legislation to provide a long term drainage strategy for implementation of the 2007 ROD.

106.    To date, Westlands' landowners have not reached any agreement or settlement with the United States regarding a negotiated, alternative drainage resolution for Plaintiffs' farmlands.

107.    To date, the United States has not fulfilled its obligations to provide drainage to Plaintiffs' farmlands.

108.    Upon information and belief, the United States has made a deliberate, affirmative, and authorized choice to defy statutory law and court orders, to renege on its drainage commitments to Plaintiffs, and to abandon a legal obligation to which the United States knows it is subject.  Upon information and belief, the United States' ongoing refusal to provide legally-mandated drainage to Plaintiffs, and its ongoing defiance of court orders to provide the drainage, is a deliberate, affirmative, and authorized act and/or series of acts undertaken for a single purpose and collectively causing the taking described here.  The United States knows it is required to provide drainage by law, knows that courts have ordered it, and yet has refused to comply, and continues to refuse.  Upon information and belief, this ongoing defiance is a deliberate, affirmative, and authorized policy choice that the United States has pursued and continues to pursue.

Losses and Injuries to Use and Value of Farmlands

109.    As a result of the United States' ongoing affirmative policy decision to not comply with its legal obligation to provide the required drainage, Plaintiffs have incurred and are threatened with the continuation and increase of various losses as a result of the lack of drainage, with corresponding invasive high water tables and accumulation of saline groundwater salts beneath and upon Plaintiffs' farmlands.  Plaintiffs' farmlands have been subject to adverse impacts that include, but are not limited to, reduced crop yields, limited crop rotations, restrictions on the types of crops that can be grown, and changes to soil quality and conditions.  All Plaintiffs have been deprived of the benefit of the full productive use of their farmlands, and the value of their farmlands has been diminished.

**CLAIM FOR RELIEF**
**Taking of Property Without Just Compensation**

110.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 109, inclusive.

111.    The United States has taken Plaintiffs' farmlands for public use without just compensation.  The properties taken include, but are not limited to, flowage and seepage easements upon Plaintiffs' lands.

112.    High water tables and the accumulation of saline groundwater beneath and upon Plaintiffs' properties are substantial, intermittent, frequent and inevitably recurring, and the interference and physical invasion by way thereof has stabilized and become permanent in nature.

113.    High water tables and the accumulation of saline groundwater beneath and upon Plaintiffs' properties are the inevitable consequence of the deliberate, affirmative, and authorized acts and policies of the United States, as described above, and are the direct and foreseeable result of said acts and policies. The acts and policies described above were undertaken for a single

purpose and collectively have caused the taking described here.  The cumulative and combined effects of those actions have led to a condition that would not have otherwise existed.

114.    Plaintiffs and their fellow Westlands landowners have at no time deviated from their contracts or the intended purposes of the San Luis Unit, nor used irrigation water in any improper way.  Instead, at all times they have used such water to irrigate their crops in the normal, ordinary, and intended way.

115.    The United States has failed to pay Plaintiffs just compensation for the taking of their properties, in violation of the Fifth Amendment to the United States Constitution, which provides, in part: "[N]or shall private property be taken for public use, without just compensation." U.S. CONST. AMEND. V.

116.    As a direct and inevitable result of the high water tables and the accumulation of saline groundwater beneath and upon their farmlands due to the deliberate, affirmative, and authorized acts and policies of the United States, Plaintiffs' use of their properties has been impaired, and their properties have been substantially devalued and taken but uncompensated for in an amount as yet unascertained.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.    That this matter be maintained and certified as a class action on behalf of all those landowners in the Westlands Water District whose lands have been physically invaded by saline groundwater as a result of the deliberate, affirmative, and authorized acts and policies of the United States to deactivate existing drainage infrastructure, to cancel planned construction efforts, and to abandon further efforts to provide drainage in defiance of known legal obligations;

2.      Just compensation in an amount that exceeds $10,000 on the claim for relief for Plaintiffs and all persons similarly situated;

3.      Prejudgment interest on any just compensation or money judgment awarded;

4.      Attorneys' fees, expert witness fees, and other costs incurred herein; and

5.      Such other and further relief as this Court may deem just and proper.


Respectfully submitted,

BEVERIDGE & DIAMOND, P.C.


Date: August 28, 2020

s/ Eric L. Klein
Gus B. Bauman
Eric L. Klein
Alexander B. Horning
1350 I Street, N.W., Suite 700
Washington, DC 20005
Tel: (202) 789-6000
Fax: (202) 789-6190
Email: gbauman@bdlaw.com
eklein@bdlaw.com
ahorning@bdlaw.com

Kaitlyn D. Shannon (admission pending)
456 Montgomery Street, Suite 1800
San Francisco, CA 94104
Tel: (415) 262-4000
Fax: (415) 262-4040
Email:  kshannon@bdlaw.com

KERSHAW, COOK & TALLEY

William A. Kershaw
401 Watt Avenue
Sacramento, CA 95864
Tel:  (916) 448-9800
Fax:  (916) 669-4499
Email:  wkershaw@kcrlegal.com